24CA1645 Peo v Nevares 02-12-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA1645
Conejos County District Court No. 17CR4
Honorable Michael A. Gonzales, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Santos G. Nevares a/k/a Santos G. Nevarez,

Defendant-Appellant.

ORDER AFFIRMED

Division II
Opinion by JUDGE FOX
Kuhn and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 12, 2026

Philip J. Weiser, Attorney General, Paul Koehler, Senior Counsel, Denver, Colorado, for Plaintiff-Appellee

Phoebe W. Dee, Alternate Defense Counsel, Basalt, Colorado, for Defendant-Appellant

¶ 1    Defendant, Santos G. Nevares a/k/a Nevarez[1] appeals the district court's order denying his petition for postconviction relief pursuant to Crim. P. 35(c).  We affirm.

## I.    Background

¶ 2    In January 2017, officers responded to an incident in Conejos County and discovered four individuals with gunshot wounds.  The prosecution later charged Nevares with over thirty counts, including first degree murder for three deceased victims and attempted first degree murder for the surviving victim.  The prosecution indicated that it was considering seeking the death penalty.[2]  Plea negotiations ensued, and on June 27, 2018, the prosecution agreed not to pursue the death penalty if Nevares pleaded guilty to two counts of first degree murder and one count of second degree murder.

---

[1] Nevares has also used the surname Nevarez.  *See People v. Nevarez*, (Colo. App. No. 20CA0786, Oct. 6, 2022) (not published pursuant to C.A.R. 35(e)).  For purposes of this appeal, we use Nevares, which is the spelling that appears on the caption pages of the parties' briefs.

[2] The events leading to the charges in this case occurred before Colorado abolished the death penalty in 2020.  Ch. 61, secs. 1, 10, §§ 16-11-901, 18-1.3-401(1)(a)(V.5)(A), 2020 Colo. Sess. Laws 204, 209–10.

¶ 3     On June 29, before counsel could present Nevares with the plea offer, he suffered an emergency medical condition requiring multiple hospitalizations and resulting in a serious infection. Nevares' counsel could not visit him until July 24 but visited him at least six times between July 24 and August 14.

¶ 4     On August 15, Nevares signed the plea agreement. At a plea hearing on August 17, pursuant to Crim. P. 11, the district court read through the agreement and confirmed that Nevares understood it. Nevares also confirmed that he (1) was mentally and physically healthy and thinking clearly; (2) understood his right to plead not guilty and to not follow counsel's advice to plead guilty; (3) made the plea agreement willingly and voluntarily; and (4) was not pleading guilty due to any "threat, coercion, undue influence, or force or promises of any kind." Nevares twice confirmed that he did not need more time to consider the plea. After the advisement, Nevares verbally pleaded guilty, and the court accepted his pleas. Pursuant to the plea agreement, the court sentenced Nevares to two life sentences without parole and one forty-eight-year sentence.

¶ 5     In April 2019, Nevares filed a pro se petition for postconviction relief pursuant to Rule 35(c). Alternate defense counsel later

supplemented the petition.  Together, the petitions alleged that (1) Nevares' guilty plea was not voluntary, knowing, and intelligent; and (2) he received ineffective assistance of plea counsel. Specifically, he alleged that counsel coerced his plea by telling him death by lethal injection would be excruciatingly painful and by promising that he would receive certain privileges and benefits while serving a life sentence that he would not receive on death row. He asserted that he accepted the plea primarily due to fear of this painful death.  And he alleged that he was particularly susceptible to counsel's pressure given his fragile physical condition.  Finally, as relevant here, he argued that his counsel performed deficiently by pressuring him to accept the plea and by making misrepresentations about the privileges he would receive while serving a life sentence in prison.

¶ 6    The district court denied Nevares' Rule 35(c) petition without a hearing, and he appealed.  *People v. Nevarez*, (Colo. App. No. 20CA0786, Oct. 6, 2022) (not published pursuant to C.A.R. 35(e)). A division of this court reversed, holding that Nevares was entitled to an evidentiary hearing.  *Id.* at ¶¶ 13-14, 20.  After a February 14, 2024, evidentiary hearing, the district court again denied Nevares'

3

request for postconviction relief. Nevares now appeals, arguing that the district court erred by concluding that the evidence presented at the hearing did not warrant postconviction relief.

## II.    Analysis

### A.    Standard of Review

¶ 7    In a Rule 35(c) proceeding, a presumption of validity attaches to a judgment of conviction. *People v. Corson*, 2016 CO 33, ¶ 25. We review the denial of a Rule 35(c) petition following a hearing for an abuse of discretion. *People v. Huggins*, 2019 COA 116, ¶ 28. A district court abuses its discretion if its decision is manifestly arbitrary, unreasonable, or unfair, or it misunderstands or misapplies the law. *Id.*

¶ 8    Whether a guilty plea was valid is a mixed question of law and fact. *Corson*, ¶ 25. Ineffective assistance of counsel claims also present mixed questions of law and fact. *Id.* For both, we defer to a district court's factual findings when they enjoy record support, but we review its legal conclusions de novo. *Id.* And "[b]ecause the [district] court is in the best position to determine the credibility of witnesses and the weight to give their testimony, we defer to its finding[s]." *People v. Pendleton*, 2015 COA 154, ¶ 13.

4

## B. Nevares' Plea Was Valid

### 1. Applicable Law

¶ 9    A guilty plea "is valid only if done voluntarily, knowingly, and intelligently, 'with sufficient awareness of the relevant circumstances and likely consequences.'" *Medina v. People*, 2023 CO 46, ¶ 17 (quoting *Bradshaw v. Stumpf*, 545 U.S. 175, 183 (2005)). This determination "depends on the circumstances of each case." *Id.* at ¶ 39. To assess a guilty plea's validity, we consider "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Id.* at ¶ 23 (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)).

¶ 10    A guilty plea is invalid if obtained by "actual or threatened physical harm or by mental coercion overbearing the will of the defendant." *Brady v. United States*, 397 U.S. 742, 750 (1970). A plea is also invalid if it is "the product of such factors as misunderstanding, duress, or misrepresentation by others." *Sanchez-Martinez v. People*, 250 P.3d 1248, 1255 (Colo. 2011) (quoting *Blackledge v. Allison*, 431 U.S. 63, 75 (1977)). "But pressure alone does not invalidate a guilty plea." *People v. Lopez*, 2025 COA 73, ¶ 30. And a guilty plea "is not invalid merely

because [it's] entered to avoid the possibility of a death penalty."
*Brady*, 397 U.S. at 755. Rather, a "plea is involuntary if [the defendant] was 'so gripped by fear . . . or hope of leniency that he did not or could not, with the help of counsel, rationally weigh the advantages of going to trial against the advantages of pleading guilty.'" *People v. Kyler*, 991 P.2d 810, 816-17 (Colo. 1999) (alteration in original) (quoting *Brady*, 397 U.S. at 750).

## 2.    Analysis

¶ 11    The first part of our analysis overlaps slightly with the question of whether Nevares' counsel was ineffective. *See People v. Pozo*, 746 P.2d 523, 526 (Colo. 1987) (When a defendant is represented, the voluntariness of his plea "depends in part upon whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'" (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970))). Nevares argues that his plea was involuntary in part due to his counsel's representations about (1) the excruciating nature of death by lethal injection and (2) the privileges he would receive while serving a life sentence in prison.

¶ 12    We agree with the district court that Nevares did not establish that his counsel's conduct rendered his plea invalid.  In its detailed order denying Nevares' petition, the court noted that it did not find Nevares credible.  It described his testimony as "self-serving" and "internally inconsistent and/or contradicted by the record."  Because these findings enjoy record support, we owe them deference.  *See Pendleton*, ¶ 13.

¶ 13    We begin with Nevares' contention that he only accepted the plea because his lead attorney, Joseph Archambault, "warned him of a painful, tortu[r]ous death by lethal injection."  Nevares testified that the subject "came up one time," and Archambault said it would be "excruciating" and "like no pain []ever."[3]  But Nevares testified that he did not believe Archambault's description of death by lethal injection and said it only scared him "a little."  When asked if he felt pressured by this description, Nevares responded, "No, not really.  At the end of the day, it was more . . . family."  Nevares also testified that several family members encouraged him to plead guilty, which

_____

[3] Archambault testified that he did not remember telling Nevares that death by lethal injection would be excruciating but agreed that he likely said something about the death penalty being "a really bad thing."

influenced his decision.  Later, in response to a question about whether he had been worried about the death penalty, he said, "I don't know" and then said he had not been.  When asked why his Rule 35(c) petition said he was terrified if that was not true, Nevares said, "I'm telling you that's not true because it was pride."  Shortly thereafter, he reversed course and said he became scared after Archambault told him how painful it was to die by lethal injection.  He also repeatedly suggested that certain statements in his pro se petition were not his own and came from a "jailhouse lawyer" who assisted him.

¶ 14    We conclude that Nevares' testimony undermines his argument that he pleaded guilty due to a fear of death by lethal injection.  While at times inconsistent, his testimony overwhelmingly suggested that such fear did *not* motivate his decision.  In short, the evidence supported the inference that he was not "so gripped by fear of the death penalty . . . that he did not or could not, with the help of counsel, rationally weigh the advantages of going to trial against the advantages of pleading guilty."  *Brady,* 397 U.S. at 750.

8

¶ 15    Next, Nevares asserts that his plea was the product of his counsel's misrepresentations about certain privileges that he would receive while serving a life sentence. He testified that Archambault said the privileges on death row were extremely limited, but he could get visits, use the phone, walk outside, attend classes, and get a job while serving a life sentence. Nevares never directly testified about how the alleged promises influenced his plea. And defense counsel's notes from August 8, 2018, said that Archambault "offered to talk to [Nevares] more about conditions [in prison] as [he] had offered before," but Nevares declined and indicated that he already knew about the conditions.

¶ 16    Archambault testified that he typically discussed conditions in the Department of Corrections (DOC) with clients. However, he explained that he had never promised a client that they would be eligible for certain privileges because "[t]he nature of DOC is that they change their policies kind of every single day. And you can't guarantee what will happen . . . ." Finally, Daniel Edwards, an expert in capital murder prosecution and defense testified about the differences between death row and serving a life sentence: "[I]f you're on death row, you're in your cell [twenty-three] hours a day

9

and let out one hour [a] day.  And you have other very limited privileges."

¶ 17    The district court's conclusions that Archambault's testimony was credible and that he made "no such promises" are supported by the record.  *See Pendleton,* ¶ 13.  While Archambault likely discussed confinement conditions with Nevares, he clarified that he made no explicit promises.  And even if Archambault told Nevares he would have fewer privileges on death row than while serving a life sentence, Edwards' testimony suggests that this was not a misrepresentation.  Moreover, Nevares failed to present evidence that the alleged promises influenced his plea to an extent that would render it involuntary.  *See Medina,* ¶ 23.

¶ 18    Nevares also contends that his plea was involuntary because he was still suffering from his illness, and his weak condition affected his decision to plead guilty.  The district court rejected this argument, and we agree.  Nevares testified that he was in the intensive care unit "most of July of 2018" and was still in extremely poor physical condition when he returned to jail.  He testified that he had lost a lot of weight, which his defense team also noted at the time.  But Archambault's notes from August 6, 2018, stated that

10

Nevares looked healthier and had said that "he was feeling much better" and "was in less pain." And although Nevares testified that, after returning from the hospital, he wanted more time to consider the plea and was drained physically and emotionally, he admitted that he was "in much less pain" when he accepted the plea. He remembered telling Archambault he felt better and was healing but testified that he lied out of pride.

¶ 19 On appeal, Nevares repeatedly argues that the district court placed too much weight on evidence that he was feeling better. But he had an opportunity at the postconviction hearing to explain not only that he remained unwell but also how this affected his plea. Instead, he testified about his physical condition without explaining its influence on his decision-making. He asks us to infer from the nature of his condition that his plea was invalid, but he presented little evidence about how his physical ailments affected his mental acuity and decision-making.

¶ 20 Additionally, during the Rule 11 advisement, Nevares said that he was healthy and thinking clearly, that his plea was not a result of coercion or "promises of any kind," and that he did not need more time to consider his decision. Such statements do not

automatically bar a later challenge to a plea's validity, but they "carry a strong presumption of verity." *Lopez*, ¶ 31 (quoting *Blackledge*, 431 U.S. at 74); *see also Medina*, ¶ 19 ("Compliance with Crim. P. 11 'normally will satisfy constitutional due process concerns.'" (citation omitted)). Given the district court's credibility determinations to which we defer, the evidence presented at the postconviction hearing — about Nevares' illness and his other allegations — was insufficient to overcome this presumption.

¶ 21 Nevares clearly struggled with what must have been a difficult decision — accept the plea and spend the rest of his life in custody or risk a death sentence. He testified that he was initially adamant about going to trial and not pleading guilty. But he acknowledged that he told Archambault he changed his mind on a sometimes daily basis. And defense counsel's contemporaneous notes from that period reflect the internal turmoil this decision caused Nevares. Ultimately, that the choice to plead guilty was difficult does not mean it was coerced or otherwise invalid. *See Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) ("While confronting a defendant with the risk of more severe punishment clearly may have a 'discouraging effect on [his] assertion of his trial rights, the

imposition of these difficult choices [is] an inevitable' — and permissible — 'attribute of any legitimate system which tolerates and encourages the negotiation of pleas.'" (citation omitted)).

¶ 22  Nevares also had multiple discussions with his defense team and his family before accepting the plea, and he received a proper Rule 11 advisement.  In sum, the record evidence supports the district court's conclusion that the evidence was insufficient to prove that Nevares' plea was not "a voluntary and intelligent choice among the alternative courses of action."  *Medina*, ¶ 23 (quoting *Alford*, 400 U.S. at 31).

### C.    Nevares' Counsel Was Constitutionally Effective

#### 1.    Applicable Law

¶ 23  For ineffective assistance of counsel claims, a defendant must establish that (1) counsel's performance "fell below an objective standard of reasonableness"; and (2) "there is 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Corson*, ¶ 34 (quoting *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984)).  In the guilty plea context, the first prong is the same, but the second prong requires "a reasonable probability that, but for counsel's

errors, [the defendant] would not have pleaded guilty." *Id.* at ¶ 35 (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)).

2.    Analysis

¶ 24    On appeal, Nevares reasserts his contention that — but for counsel's inappropriate pressure to accept the plea — he would not have pleaded guilty. We disagree. We have already concluded that any such alleged pressure did not invalidate his plea. Additionally, the defense team's notes indicated that Nevares' counsel repeatedly emphasized that the decision to plead guilty was Nevares' and his alone to make. Archambault, who had been a public defender for fourteen years, testified that this was his standard practice. He also testified that, pursuant to American Bar Association (ABA) guidelines, he was obligated to do everything possible to avoid a client receiving the death penalty, including pursuing a plea to life without parole. *See ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* § 10.9.1 cmt. (rev. ed. 2003), *reprinted in* 31 Hofstra L. Rev. 913, 1040 (2003); *Florida v. Nixon*, 543 U.S. 175, 191 (2004).

¶ 25    Finally, Edwards, the expert witness, testified that Nevares received effective representation. He explained that ABA guidelines

14

require discussing lethal injection with a client, including that it could be extremely painful. And he testified that defense counsel should explain the different privileges and living conditions of different levels of confinement.

¶ 26    We are also not persuaded by Nevares' contention that "the lack of contemporaneous notes from defense counsel" from the day he signed the plea agreement supports a conclusion that counsel pressured him to accept the plea. We employ a strong presumption that counsel rendered adequate assistance. *People v. Wardell*, 2020 COA 47, ¶ 29. The defendant must overcome this presumption by establishing that counsel's errors were "so flagrant that they more likely resulted from neglect or ignorance." *Id.* (citing *Strickland*, 466 U.S. at 690). The mere absence of notes from the day Nevares signed the plea is insufficient to overcome this presumption.

¶ 27    All told, Nevares failed to establish that his counsel's performance "fell below an objective standard of reasonableness." *Corson*, ¶ 34 (quoting *Strickland*, 466 U.S. at 687-88). So the district court did not abuse its discretion by denying his petition for postconviction relief. *Huggins*, ¶ 28.

### III. Disposition

¶ 28    The district court's order denying relief under Rule 35(c) is affirmed.

JUDGE KUHN and JUDGE SULLIVAN concur.